**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KARES MANAGEMENT, INC. f/k/a OTS HOLDINGS, INC., on behalf of itself and all others similarly situated, | Case No.: |
| Plaintiff, | **COMPLAINT AND JURY DEMAND** |
| v. | **PUTATIVE CLASS ACTION** |
| ADP, LLC, | |
| Defendant. | |

Plaintiff Kares Management, Inc., formerly known as OTS Holdings, Inc., brings this action, on behalf of itself and all others similarly situated, against Defendant ADP, LLC, and alleges as follows:

## INTRODUCTION

1.      This is a class action, brought under New York law, on behalf of a proposed class of consumers who were overcharged for services they purchased from Defendant.

2.      Defendant is a company that provides various payroll and human resource management services to business throughout the United States.

3.      In exchange for those services, Defendant charges its business customers a periodic fee, which is established by contract at the outset of the relationship but is typically based on the number of employees the customer has (e.g., Defendant may charge $1.50 per employee per month for a specific service).  Thus, a customer with 100 employees will generally pay more for the same services than will a customer with only 50 employees.

4.      The total fee charged by Defendant to a customer can fluctuate from week to week or month to month if the customer gains or loses employees.  Thus, if a business with 100

employees is forced to lay off or terminate half of its workforce, it should pay a lower monthly fee for the same services after the layoffs.  But that is not always the case.

5.      Although the fees for most of Defendant's services will be reduced by the termination of an employee, for a few services – typically the more expensive ones – the fees will <u>not</u> be reduced merely by terminating an employee, but rather require the additional and separate step of "archiving" the employee in order to receive a reduced fee for that service.

6.      Unfortunately, Defendant does not disclose, or does not adequately disclose, to its customers that they must manually archive their terminated employees to receive a reduced fee for these services.  Consequently, many customers, like Plaintiff, continue to be charged and pay higher fees than they should be paying for services that Defendant is not actually providing for their employees who were terminated but never archived.

7.      Worse, Defendant takes steps to purposefully obscure from its customers the need to archive their terminated employees – <u>e.g.</u>, by issuing misleading invoices that hide Defendant's overcharges; by refusing to separately bill for non-archived, terminated employees as required by its customer agreements; and even by misrepresenting to its customers that they do not need to archive employees but overcharging them for those employees anyway – so that Defendant can collect additional, unearned fees from its customers.

8.      Plaintiff and the class have been compelled to pay substantial sums of money to Defendant in the form of overcharges as a result of Defendant's deceptive conduct and policies. Indeed, Plaintiff estimates that it alone has paid at least $61,000.00 in unearned, unlawful overcharges to Defendant.

9.     As alleged in greater detail herein, Defendant's policies constitute deceptive business practices in violation of New York General Business Law § 349, and further violate New York common law as set forth herein.

10.     This action seeks redress for Plaintiff and the class in the form of compensatory damages, punitive damages, and injunctive relief, which would include, inter alia, an order directing Defendant to cease the challenged practices or provide adequate notice to the class thereof, and to initiate a court-supervised program to refund any and all overcharges paid by Plaintiff and the class.

## THE PARTIES

11.     Plaintiff Kares Management, Inc., formerly known as OTS Holdings, Inc., is a New Jersey corporation headquartered in Cherry Hill, New Jersey.

12.     Like all class members, Plaintiff purchased payroll and human resource management services from Defendant and was overcharged by Defendant for those services in the manner described herein.

13.     Defendant ADP, LLC is a Delaware limited liability company with its principal place of business located at One ADP Boulevard, Roseland, New Jersey 07068.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332, because: (a) there are 100 or more class members, (b) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, to a reasonable probability; and (c) there is minimal diversity because at least one class member is a citizen of a state different from at least one Defendant.

15.     This Court has in personam jurisdiction over the Defendant because, inter alia, Defendant: (a) transacted business in this state; (b) maintained continuous and systematic contacts in this state prior to and during the class period; and (c) purposefully availed itself of the benefits of doing business in this state.  Accordingly, Defendant maintains minimum contacts with this state which are more than sufficient to subject it to service of process and to comply with due process of law.

16.     Moreover, the Global Master Services Agreement (Attachment A hereto) between Defendant and Plaintiff and the class provides at Para. 15.13 that the parties **"irrevocably consent to the … jurisdiction"** of this Court, expressly stating:

> **Any disputes that may arise between ADP and client regarding the performance or interpretation of this Agreement shall be subject to the exclusive jurisdiction of the state and federal courts of New York, New York. The parties hereby irrevocably consent to the exclusive jurisdiction of the state and federal courts of New York, New York and waive any claim that any proceedings brought in such courts have been brought in an inconvenient forum.**

17.     Based on the foregoing provision of the Global Master Services Agreement between Defendant and Plaintiff and the class, venue is also proper in this District.  See id.

## GOVERNING LAW

18.     The Global Master Services Agreement (Attachment A hereto) between Defendant and Plaintiff and the class further provides at Para. 15.12 that the law of New York applies to all claims of Plaintiff and the class, expressly stating:

> **This Agreement is governed by the laws of the State of New York without giving effect to its conflict of laws provisions.**

19.     Similarly, Annex A to the Master Services Agreement between Defendant and Plaintiff and the class provides at Para. 9.I. that New York law applies, stating:

> **This Agreement is governed by the laws of the State of New York without giving effect to its conflict of laws provisions.**

20.     Consequently, New York law applies to this case and all claims of Plaintiff and the class.

## FACTS GIVING RISE TO THE CAUSES OF ACTION

21.     Defendant is in the business of providing payroll and human resource management services and software to businesses around the United States.

22.     Defendant holds itself out on its website www.adp.com that it is "affordable" and "trusted by nearly 700,000 small businesses."

23.     Defendant charges its business customers a fee in exchange for the services it provides to them, typically on a weekly or monthly basis.

24.     The total fee charged by Defendant is established by agreement at the outset of the relationship with the customer and is largely based on the specific services a customer elects to receive and the number of employees the customer has.  For example, Defendant may charge a customer $1.50 per employee per month for a specific service, such that a customer with 100 employees would be charged $150.00 per month for that service.

25.     Thus, a customer with more employees should be charged by Defendant – and should have to pay to Defendant – more money for the same services than a company with fewer employees.

26.     Because the fees charged by Defendant are based on the number of a customer's employees, the total fees charged by Defendant to a customer can fluctuate from month to month, for example, if the customer hires or lays off employees.  If a customer hires more employees, it will be charged more.  If a customer lays off or terminates employees, it should be charged less.

27.     Defendant has a uniform policy of repeatedly informing its customers, prior to and at the commencement of providing any services to the customer, as well as throughout its business relationship with the customer, that the customer will be charged based on the number of employees it has.  This standard is set forth in Defendant's contracts with its customers as well as in each and every invoice.

28.     One service provided by Defendant to its customers is ADP Workforce Now, which Defendant describes as an "all-in-one" platform for payroll and human resource software that "provides expert support and analytics for data-driven insights."

29.     Defendant's Workforce Now platform includes several sub-services, such as Workforce Now Payroll Solutions and Workforce Now HR Solutions.

30.     Even though both of these sub-services are part of the same Workforce Now platform, Defendant uses a different criteria for calculating the weekly or monthly fee charged for each service.

31.     Specifically, Defendant calculates the fee it charges for the Workforce Now Payroll Solutions service based on the number of non-terminated employees a company has, while it calculates the fee charged for the Workforce Now HR Solutions service based on the number of non-archived employees a company has.

32.     Defendant's use of different criteria for charging fees for its Workforce Now Payroll Solutions and HR Solutions services – even though both services are part of the same Workforce Now platform – was and is intentional.

33.     Indeed, Defendant set up its fee calculation in this manner so that, when a customer terminates an employee, it will designate the employee as "terminated" in Payroll Solutions, but will neglect to "archive" the employee in HR Solutions.

34.    Thus, the customer will no longer have to pay Defendant each week or each month for the terminated employee in Payroll Solutions – a less expensive service – but it will continue to have to pay Defendant for the terminated, but non-archived, employee in HR Solutions, the more expensive service.

35.    Defendant is not actually providing any services to its customers for these terminated employees who were never archived; thus, the monthly fees charged by and paid to Defendant for terminated but non-archived employees are not earned by Defendant.

36.    Defendant never informed, or never adequately informed, its customers that they need to archive their terminated employees to avoid paying this higher, unearned fee.

37.    Defendant's scheme to squeeze more money out of its unsuspecting customers is underscored by the form documents which constitute the agreements for services between Defendant and its customers.

38.    Prior to or in conjunction with providing any service to a business customer, Defendant has a uniform policy of requiring the customer to sign or execute a Global Master Services Agreement, which describes in general the services that Defendant will provide to the customer and sets forth the terms and conditions governing the provision and receipt of those services.  See, e.g., Attachment A hereto, Global Master Services Agreement between Defendant and Plaintiff.

39.    Throughout the class period, the form Global Master Services Agreement that Defendant provided to its customers, and required its customers to sign or execute, was substantially identical to the Global Master Services Agreement between Defendant and Plaintiff attached hereto as Attachment A.

40.    Appendix 1 of the Global Master Services Agreement contains a fee schedule that sets forth the allowable fees and rates that Defendant may charge its customers, not only for the services that are to be provided by Defendant, but also for "additional services" that the customer may require after the agreed-upon services commence.  See Attachment A at Appendix 1.

41.    The Global Master Services Agreement does not mention the need for a customer to archive its terminated employees in order to avoid being charged for them.  See id.

42.    Additionally, prior to or in conjunction with providing any service to a customer, Defendant has a uniform policy of requiring the customer to sign or execute a Sales Order and Master Services Agreement, which supplements the Global Master Services Agreement and sets forth the specific services that Defendant will provide to the customer.  See, e.g., Attachment B hereto, Sales Orders between Defendant and Plaintiff.

43.    Throughout the class period, the form Sales Order and Master Services Agreement that Defendant provided to its customers, and required its customers to sign or execute, was substantially identical to the Sales Orders and Master Services Agreement between Defendant and Plaintiff.  See Attachment B, Sales Orders between Defendant and Plaintiff.

44.    The Sales Order lists the specific services that the customer will receive from Defendant, as well as the specific fees that the customer will pay for such services and the basis of those fees.  See Attachment B.

45.    The Master Services Agreement, which Defendant designates as "Proprietary and Confidential," describes the specific services that Defendant will provide to the customer and sets forth the terms and conditions governing the provision and receipt of those services.

46.    The terms and conditions set forth in the Master Services Agreement, inter alia, delineate the responsibilities of the customer with respect to the services provided by Defendant.

47.     Significantly, none of these contractual documents adequately inform or convey to Defendant's customers their need to archive terminated employees in order to avoid being charged for them.

48.     Beyond these contractual documents, Defendant has taken additional steps in all aspects of its relationship with its customers, including Plaintiff and the class, to obscure the customer's need to archive terminated employees.  As a result of these actions, Defendant's customers have been forced to pay additional, unearned fees to Defendant.

49.     What happened to Plaintiff helps illustrate Defendant's unlawful and deceptive practices described herein.

50.     Plaintiff Kares Management, Inc., formerly known as OTS Holdings, Inc., is, or was during the class period, a management company for several related business, including On Time Staffing, LLC; NPM Staffing, LLC; InterSolutions, LLC; and OTS HCM, LLC.

51.     In or around December 2014, Plaintiff entered into an agreement with Defendant for Defendant to provide various payroll and human resource services to Plaintiff and Plaintiff's related businesses beginning in 2015.

52.     As is Defendant's uniform practice, Plaintiff was required to, and did, sign a Global Master Services Agreement with Defendant.  See Attachment A.

53.      The Effective Date of the Global Master Services Agreement between Plaintiff and Defendant was September 21, 2015.  See Attachment A.

54.     Like that of other class members, Appendix 1 of the Global Master Services Agreement between Plaintiff and Defendant contained a fee schedule that set forth the allowable fees and rates that Defendant could charge Plaintiff, not only for the services that were to be

provided to Plaintiff by Defendant, but also for "additional services" that Plaintiff might require after the agreed-upon services commenced.  See Attachment A at Appendix 1.

55.    Appendix 1 of the Global Master Services Agreement between Plaintiff and Defendant also provided that the fees set forth therein would remain fixed for two years following the Effective Date of the Agreement.  See Attachment A at Appendix 1, Para. 9:

> **Fee Adjustments:  The fees set forth in this Appendix will remain fixed for two years following the Effective Date.  During the third year following the Effective Date any increase in fees will not exceed 2.5%.  After the Initial Term, ADP may modify the fees on an annual basis upon 90 days' prior written notice to Client.**

56.    Additionally, as is Defendant's uniform practice, Plaintiff was required to, and did, sign a Sales Order and Master Services Agreement with Defendant.  See Attachment B.

57.    The initial Sales Order between Plaintiff and Defendant was signed on December 4, 2014, and a second Sales Order was signed on November 15, 2015.  See Attachment B.

58.    Like that of other class members, the Sales Orders between Plaintiff and Defendant listed the specific services that Plaintiff would receive from Defendant, as well as the specific fees that Plaintiff would pay for such services and the basis of those fees.  See Attachment B.

59.    The initial Sales Order between Plaintiff and Defendant provided that Plaintiff would receive the following services from Defendant:  (a) "Workforce Now Enhanced Payroll," for which Plaintiff would be charged by, and would pay to, Defendant a specified weekly fee for each of its "150" employees; and (b) "Workforce Now HR Solutions," for which Plaintiff would be charged by, and would pay to, Defendant a specified monthly fee for each of its "150" employees.  See Attachment B.

60.    The second Sales Order between Plaintiff and Defendant provided that Plaintiff would receive an additional service from Defendant:  "Workforce Now HR Solutions – Essential

ACA." The second Sales Order also provided that Plaintiff would be charged by, and would pay

to, Defendant a specified monthly fee for each of its "128" employees. See Attachment B.

61. Additionally, the second Sales Order between Plaintiff and Defendant stated:

**The billing count for Essential Time is based on all non-terminated employees in the Time Module. <u>The billing count for the HR Solutions is based on all employees in the database that have not been archived. Any 'non-archived' employees coded as Non-Paid will be billed separately.</u>**

See Attachment B (emphasis added).

62. This was Defendant's first – and only – reference to archiving terminated

employees in any of Plaintiff's contractual documents.

63. The Effective Date of Plaintiff's Master Services Agreement with Defendant was

November 2, 2015.

64. Like that of the other class members, the Master Services Agreement between

Plaintiff and Defendant was designated "Proprietary and Confidential," described the specific

services that Defendant would provide to Plaintiff, set forth the terms and conditions governing

the provision and receipt of those services, and delineated Plaintiff's responsibilities with respect

to those services.

65. In contrast to the Global Master Services Agreement, however, the Master

Services Agreement provided that Plaintiff would pay the rates specified in the Sales Order only

for the first six months after the Effective Date, stating at Annex A, Para. 2.A.:

**Fees. <u>Client shall pay ADP for the ADP Products and Services at the rate specified in the Sales Order … for the first six (6) months after the Effective Date,</u> or if there is a Price Agreement for certain ADP Products or Services, for the term set forth therein (the "Initial Period"). Client shall pay ADP for the ADP Products and Services added by Client after the Effective Date at ADP's prevailing prices for such ADP Products and Services. Subject to any Price Agreement, ADP may increase prices for the ADP Products and Services at any time after the Initial Period upon at least thirty (30) days prior written notice to Client if such change is part of a general price change by ADP to its clients for affected items.**

66.     Plaintiff alleges that the disparity between the "Initial Term" of two years set forth in the Global Master Services Agreement and the "Initial Period" of six months set forth in the Master Services Agreement was intentional.

67.     As a matter of uniform policy, Defendant required its customers, like Plaintiff and the class, to sign the Global Master Services Agreement first, with the expectation that all quoted fees would be fixed for two years.  Defendant then required its customers, like Plaintiff and the class, to sign the Master Services Agreement thereafter, which reduced the fixed-rate time period to just six months (or another shorter time period).

68.      Moreover, as with the other class members, none of the contractual documents between Plaintiff and Defendant adequately informed or conveyed to Plaintiff its need to archive terminated employees in order to avoid being charged for them.

69.     Rather, the only statement referencing the need to archive employees in any of these agreements between Plaintiff and Defendant was in Defendant's form Sales Order, which was not provided to Plaintiff until nearly one year after Plaintiff began purchasing services from Defendant (and nearly one year after it began paying fees for its non-archived employees), and merely stated that "**The billing count for the HR Solutions is based on all employees in the database that have not been archived.**"  However, that paragraph went on to say that "**Any 'non-archived' employees coded as Non-Paid will be billed separately**" – which Defendant did not (and does not) do.  <u>See</u> Attachment B.

70.     Indeed, Defendant never billed Plaintiff separately for its non-paid, non-archived employees, but rather lumped all of Plaintiff's current and former employees together in a single category and bill.  <u>See</u> Attachment E (exemplar invoices from Defendant to Plaintiff).

71.     In this manner, Defendant not only violated its agreement with Plaintiff, but also was able to hide Plaintiff's need to separately archive its terminated employees to avoid being charged for them.

72.     The only time Defendant ever informed Plaintiff of any specific need to archive employees to avoid overcharges was via a series of emails in late 2016, nearly two years after it first began providing services to Plaintiff.

73.     Specifically, on November 25, 2016, Defendant's Project Manager for Major Accounts, Matt Sargent, sent an email to Plaintiff with the subject line **"Information on Archiving Employees."**  The email contained links instructing Plaintiff how to archive employees, and stated:

> **During your recent Employee Data conversion we spoke about the ability to Archive employees within your database. Below is a recap of our conversation for your records and how archiving or non-archiving affects your Workforce Now employee billing count.**
>
> **Billing considerations:**
>
> **<u>Note the monthly processing fees for the Modules are based on the number of employees (paid or non-paid) within the Workforce Now database who are not in an archived status during any given month. As such, you will be billed for all non-archived persons in the Module, including terminated employees. You are not billed for records that are archived in the Module so there may be significant cost savings to you if the terminated employee records are archived upon initial load.</u>**
>
> **<u>We have adjusted for the first months billing cycle to recognize number of employees indicated on the sales orders as we understand we could be loading many terminated employees for reporting purposes. It is your responsibility to review and archive all employees you do not wish to be billed for after the first payroll is processed.</u>**
> **<u>If you purchased your ADP solution as a bundled solution, your billing count is not affected by the archive employee count.</u> Please just use this correspondence as a courtesy only to advise you in writing of the availability of this feature.**

<u>See</u> Attachment C (emphasis added).

74.    Also on November 25, 2016, Defendant's Project Manager for Major Accounts, Matt Sargent, sent a follow-up email to Plaintiff with the subject line **"My apologies."**  The second email stated:

> **I forgot to go over this on today's call but basically stating that once they terminate an employee they have the ability to place the employee into an archive status to hold onto historical data. <u>If they stay inactive but not in the archive status then the client will be billed for each employee held in the inactive but not archived status.</u>**

<u>See</u> Attachment D (emphasis added).

75.    Based on these two emails, which for the first time apprised Plaintiff of a potential need to archive its terminated employees in order to avoid additional charges, Plaintiff requested additional information from Defendant regarding the archiving process, as well as a list of archived employees and a recent invoice from which Plaintiff could determine how much money it would save by archiving employees.  <u>See</u> Attachment D.

76.    However, on December 14, 2016, in response to Plaintiff's inquiry, Defendant's Project Manager for Major Accounts Matt Sargent recanted his earlier email of November 25 and stated as follows:

> <u>**I misspoke to Michelle in an earlier conversation.**</u> **This is based on the sales order and how it is put together. <u>Both the company Michelle is currently working with and your company [Plaintiff Kares Management, Inc. f/k/a OTS Holdings, Inc.] are set to a no charge with employees that are terminated but not in the archived status. Both sales orders are bundled together and those orders are set to a no charge.</u>**

<u>See</u> Attachment D (emphasis added).

77.    Accordingly, in addition to failing to mention any need to archive terminated employees to avoid additional charges in its initial agreements with Plaintiff, <u>Defendant specifically told Plaintiff that it did not need to archive its terminated employees.</u>

78.    Despite this express representation, and unbeknownst to Plaintiff, Defendant had in fact been charging Plaintiff for its terminated, but non-archived, employees for nearly two years.

79.    Plaintiff replied to Defendant's email:  **"Thanks for clearing this up Matt! So neither company needs to archive then? Even better!"**  See Attachment D.  Defendant did not respond to this email.

80.    This is consistent with the November 25, 2016 email referenced herein which stated "**If you purchased your ADP solution as a bundled solution, your billing count is not affected by the archive employee count**" – which in this case, Plaintiff purchased ADP services as a bundled solution.  See Attachment C.

81.    Consequently, based on Plaintiff's initial agreements with Defendant, which did not mention any need to archive terminated employees to avoid additional charges, and Defendant's specific direction that Plaintiff did not need to archive its terminated employees to avoid additional charges, Plaintiff did not archive any of its terminated employees.

82.    Contrary to its representations, however, Defendant was in fact charging Plaintiff extra fees for its terminated but non-archived employees throughout the class period.

83.    Indeed, Defendant had been charging Plaintiff extra fees for its terminated but non-archived employees since the very outset of their business relationship in January 2015 – nearly a full year before Plaintiff signed its second Sales Order in November 2015, which contained Defendant's first and only reference to archiving terminated employees in any of Plaintiff's contractual documents, and nearly two years before Defendant expressly told Plaintiff that it would not be charged for employees who were terminated but not archived.

84.    For example, Defendant's August 2015 invoice to Plaintiff contained charges for Workforce Now HR services based on 186 non-archived employees.  Yet the same invoice contained charges for payroll services that were based on just 133 active, non-terminated employees.  Thus, Defendant knew that Plaintiff only had 133 active employees at the time of this invoice, but it still charged Plaintiff for 53 terminated employees who had not been archived – an overcharge of $516.22 – despite having never informed Plaintiff of any need to archive these employees.  See Attachment E (exemplar invoices).

85.    Another example is Plaintiff's January 2017 invoice – the first monthly invoice Plaintiff received after it was expressly told by Defendant that it would not be charged for non-archived, terminated employees.  This invoice included charges for 149 employees who were terminated but not archived.  See Attachment E.  Again, at the time of this invoice, Defendant was aware that Plaintiff had only 135 active, non-terminated employees, but it still charged Plaintiff for a total of 284 non-archived employees.  See id.

86.    Yet another example is Plaintiff's April 2017 invoice.  This invoice is broken into two parts:  "ADP Payroll Services" and "Workforce Now."  In the Payroll Services section, Plaintiff was charged for 142 non-terminated employees.  But in the Workforce Now section, Plaintiff was improperly charged for 302 employees – a number which included 160 terminated, but not archived, employees.  See Attachment E.  This resulted in an overcharge of $953.60.

87.    Again, Defendant was aware that Plaintiff only had 142 active employees in April 2017, as it only charged Plaintiff for those 142 active employees in the Payroll Services section of Plaintiff's invoice.  See id.

88.     Defendant's overcharges for Plaintiff's terminated, non-archived employees continued on a monthly basis, and in fact grew larger each month as Plaintiff lost more and more employees who were terminated but never archived.

89.     By way of further example, Plaintiff's August 2017 bill included a Payroll Services charge based on 139 active, non-terminated employees, and an improper Workforce Now charge based on 321 employees.  The Workforce Now number included 182 terminated, but not archived, employees, resulting in an overcharge of $1,101.10.  See Attachment E.

90.     Similarly, Plaintiff's July 2018 bill included a Payroll Services charge based on 141 non-terminated employees, and an improper Workforce Now charge based on 385 employees.  The Workforce Now number included 244 terminated, but not archived, employees, resulting in an overcharge of $1,517.68.  See Attachment E.

91.     Defendant's overcharges continued each month through Plaintiff's August 2019 bill, which included a Payroll Services charge based on 49 non-terminated employees, and an improper Workforce Now charge based on 420 employees.  The Workforce Now number included 371 terminated, but not archived, employees, resulting in an overcharge of $2,370.69. See Attachment E.

92.     In or around August of 2019, Plaintiff finally discovered that it was being overcharged, on a monthly basis, for 371 terminated employees.  Upon raising the issue with Defendant, Defendant informed Plaintiff – contrary to its specific instructions to Plaintiff in December 2016 – that Plaintiff should have been archiving its terminated employees all along. The issue was corrected on Plaintiff's September 2019 bill and thereafter, but Defendant did not refund any of the overcharges to Plaintiff.

93.     According to Plaintiff's calculations, Plaintiff was overcharged for a period of approximately 55 months – from January 2015 through August 2019 – at an estimated average rate of at least $1,100 per month, for a total of at least $61,000.00 in overcharges.

94.     Plaintiff did not – and indeed could not, through reasonable investigation – discover Defendant's overcharges due to Defendant's uniform deceptive and misleading business and billing practices described herein.

95.     These uniform practices, which are prohibited by New York law, enabled Defendant to collect thousands of dollars in unearned fees and overcharges from Plaintiff – estimated to be at least $61,000.00 – and the class members.

96.     What happened to Plaintiff was not an accident or an isolated incident, nor are the events described herein limited to Plaintiff's interaction with Defendant.

97.      Rather, it was part of a uniform, intentional course of conduct by Defendant, in which Defendant, through a series of deceptive and misleading business practices, was able to collect thousands of dollars of unearned fees and overcharges from Plaintiff and the class.

98.     Defendant's unlawful practices include the following.

99.     First, Defendant established multiple sub-services within its Workforce Now platform that use different criteria to calculate fees.  For example, the fees for Defendant's Workforce Now Payroll Solutions service are based on the number of non-terminated employees, while the fees for Defendant's Workforce Now HR Solutions service are based on the number of non-archived employees.

100.     This uniform practice is and was misleading to Defendant's customers – Plaintiff and the class – because when a customer fires or lays off an employee and marks him or her as

"terminated" in Workforce Now Payroll Solutions, it must also take the additional step of "archiving" the employee in Workforce Now HR Solutions.

101.    There is no good reason for Defendant to calculate fees using different criteria for two different sub-services within the same Workforce Now platform.  Nor is there any good reason why a person marked as "terminated" cannot automatically be "archived" (and vice versa) within the same platform or cannot automatically be recognized as non-active for billing purposes.  Indeed, the only reason Defendant uses this dual method of fee calculation is to confuse its customers and collect more fees.

102.    Second, Defendant fails to disclose, or to adequately disclose, to its customers – Plaintiff and the class – that they need to archive their terminated employees to avoid overcharges.  As noted above, the archiving process is not explained at all in Defendant's contractual agreements with its customers, but rather is merely referenced in passing (at most), often months after Defendant has begun providing services and charging fees to its customers.  See Attachments A and B.  Significantly, none of Defendant's customer agreements – the documents that define the contractual relationship between Defendant and its customers – explain the need for a customer to archive its terminated employees to avoid an overcharge.

103.    Third, Defendant structures its invoices in a confusing and misleading manner, such that its customers – Plaintiff and the class – cannot determine if they are being charged correctly in accordance with their contractual agreements, or if they are being overcharged by Defendant.  See Attachment E.  Through this uniform practice, Defendant can overcharge its customers with impunity and significantly reduce the chance that any customer will notice the overcharge.

104.    Indeed, despite the fact that Defendant's Sales Order -- which, as noted above, was not provided to Plaintiff until nearly a year after the commencement of service (and the start of the complained-of overcharges) – specifically states that **"Any 'non-archived' employees coded as Non-Paid will be billed separately,"** this is not the case in practice.  See Attachment B, Sales Order between Plaintiff and Defendant.  Rather, as evidenced by Defendant's invoices to Plaintiff, the non-archived, terminated (i.e., Non-Paid) employees are always simply "lumped" together with active employees.  See Attachment E.  In addition to contradicting the parties' agreement, this further obscures Defendant's invoicing and overcharging procedure, as it hides the fact that Defendant's customers are being charged for terminated employees.

105.    Finally, Defendant has a uniform policy of instructing its customers that they do not need to archive their employees, or that they will not be charged extra fees for non-archived employees, as Defendant did to Plaintiff.  See Attachment C, D.  This is a blatant misrepresentation because Plaintiff was – and the class was and is – regularly being charged for terminated employees who were never archived.

106.    These uniform actions and policies, both individually and in concert, constitute deceptive, misleading, and unlawful business practices, and enabled Defendant to collect thousands of unearned fees from Plaintiff and the class, fees in exchange for which it never provided any services whatsoever.

107.    Defendant's conduct described herein constitutes a material misrepresentation, an omission of material fact, and a deceptive business practice in violation of the New York General Business Law § 349, and further violates New York common law.  Plaintiff and the class members suffered damages as a proximate result of Defendant's actions.

## CLASS ALLEGATIONS

108.    Plaintiff brings this action as a class action pursuant to Rule 23(b)(2) and/or Rule

23(b)(3) of the Federal Rules of Civil Procedure, on behalf of a nationwide class defined as

follows:

> **All persons in the United States who, between March 5, 2015 and the present, received ADP Workforce Now or other services from Defendant pursuant to the form Global Master Services Agreement substantially identical to Attachment A hereto and the form Sales Orders substantially identical to Attachment B hereto, and were charged a periodic fee for both active and terminated employees who had not been "archived."**

109.    Excluded from the class are Defendant, its affiliates, employees, officers and

directors, and the Judge(s) assigned to this case.

110.    Plaintiff reserves the right to amend or modify the proposed class definition in

connection with a motion for class certification or as warranted by discovery.

111.    This action has been brought and may properly be maintained on behalf of the

class proposed herein under the criteria set forth in Federal Rule of Civil Procedure 23.

112.    The members of the class for whose benefit this action is brought are so numerous

that joinder of all members is impracticable.

113.    Upon information and belief, the proposed nationwide class is composed of over

100 persons.  The exact number of class members in the proposed class may be ascertained from

Defendant's books and records.

114.    No violations alleged in this complaint are a result of any oral communications or

individualized interaction of any kind between class members and Defendant.

115.    Rather, all claims in this matter arise from the uniform, unlawful policies of

Defendant outlined in detail herein.

116.    There are common questions of law and fact affecting the rights of all class members, including the following:

a.   whether Defendant's actions and uniform policies alleged herein occurred;

b.   whether Defendant used different criteria to calculate fees for different sub-services within the same platform;

c.   whether Defendant failed to disclose, or failed to adequately or timely disclose, to its customers that they would be charged additional fees for any terminated employees who were not archived, or that they could avoid such a fee by taking the additional step of archiving terminated employees;

d.   whether Defendant's invoices help conceal Defendant's overcharges;

e.   whether Defendant's invoices violate the agreements between Defendant and its customers, in that they do not separately bill non-paid, non-archived employees;

f.   whether Defendant has a uniform policy of instructing customers that they will not be charged additional fees for non-archived employees, when in fact they will be;

g.   whether these practices, either individually or taken together, were deceptive and misleading business practices;

h.   whether these practices, either individually or taken together, enabled Defendant to collect money from Plaintiff and the class to which it was not entitled;

i.   whether Plaintiff and the class are entitled to injunctive relief in the form of an order directing Defendant to stop the practices detailed herein or provide adequate notice thereof, and establishing a Court-administered program to provide refunds of any and all overcharges paid to Defendant by Plaintiff and the class members;

j.   whether Defendant's conduct was a violation of New York General Business Law § 349;

k.   whether Defendant's conduct constituted a breach of contract;

l.   whether Defendant's conduct constituted a breach of the implied covenant of good faith and fair dealing; and

m.  whether Defendant was unjustly enriched from its actions alleged herein.

117.    Each of these enumerated questions of law and fact is common to each member of the proposed class.

118.    Plaintiff is a member of the class it seeks to represent.

119.    The claims of Plaintiff are not only typical of all class members; they are identical.

120.    Plaintiff's claims arise from the same factual and legal bases as those of the other class members, and Plaintiff asserts the same legal theories as all class members.

121.    Plaintiff has no interest antagonistic to, or in conflict with, the class.

122.    Plaintiff will thoroughly and adequately protect the interests of the class, having obtained qualified and competent legal counsel to represent himself and those similarly situated.

123.    Defendant has acted or refused to act on grounds generally applicable to the class, thereby making appropriate injunctive and declaratory relief for the class as a whole.

124.    The prosecution of separate actions by individual class members would create a risk of inconsistent adjudications, would be economically wasteful, and would cause needless expenditure of judicial resources.

125.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

126.    Common questions will predominate, and there will be no unusual manageability issues.

## COUNT I

## BREACH OF CONTRACT

127.    Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

128.    There existed a contract between Defendant and Plaintiff and each class member for the sale of services.

129.    By the acts alleged herein, Defendant has breached its contract with Plaintiff and each class member.

130.    Specifically, Defendant has breached its contracts with Plaintiff and the class by, inter alia, charging Plaintiff and the class an additional fee for terminated employees who were never archived, and failing to separately bill non-paid, non-archived employees, in violation of those contracts.

131.    Defendant's breach of contract has caused Plaintiff and the class to suffer injury and damages, in that they were forced to pay Defendant more than they should have paid under the controlling contracts.

132.    As a result of Defendant's breach of contract, Plaintiff and the class are entitled to legal and equitable relief including damages, costs, attorneys' fees, and/or other relief as deemed appropriate.

## COUNT II

### BREACH OF IMPLIED CONTRACT THROUGH VIOLATION OF
### THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

133.    Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

134.    By operation of law, there existed an implied duty of good faith and fair dealing in connection with each contract between Defendant and Plaintiff and each class member.

135.    By the acts alleged herein, Defendant has violated that duty of good faith and fair dealing, thereby breaching the contract between Defendant and Plaintiff and each class member.

136.    Specifically, Defendant, <u>inter alia</u>: (a) used different criteria to calculate fees for different sub-services within the same platform; (b) failed to disclose, or failed to adequately disclose, to its customers that they would be charged additional fees for any terminated employees who were not archived, or that they could avoid such a fee by taking the additional step of archiving terminated employees; (c) structured its invoices in a confusing and misleading manner so that its customers could not determine the accuracy of Defendant's charges or identify Defendant's overcharges; (d) neglected to bill non-paid, non-archived employees separately from active employees, as provided in its form customer agreements; and (e) misrepresented that its customers did not need to archive employees, and that they would not be charged for terminated employees who were not archived, and then charged them for such non-archived employees.

137.    As a result of these breaches, Plaintiff and each class member has suffered damages as described herein.

## COUNT III

### DECLARATORY AND INJUNCTIVE RELIEF

138.    Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

139.    Defendant has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate for the class as a whole within the meaning of Federal Rule of Civil Procedure 23(b)(2).

140.    Plaintiff and the class are in need of an order requiring Defendant to stop the unlawful practices described herein, or alternatively to provide adequate notice of said practices to its customers, including Plaintiff and the class.

141.    Plaintiff and the class are also in need of a court-supervised program to provide refunds to all class members who paid overcharges to Defendant.

142.    Accordingly, Plaintiff, on behalf of itself and the class members, seeks a court order for declarative and injunctive relief:

    a.    Declaring that Defendants practices described herein are unlawful;

    b.    Enjoining Defendant from such practices in the future, or requiring Defendant to provide adequate notice of said practices to its customers; and

    c.    Directing Defendant to institute a court-administered campaign to provide refunds to each class member who paid fees to Defendant for terminated employees who were never archived.

## COUNT IV

### QUASI-CONTRACT/DISGORGEMENT/ RESTITUTION

111.    Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

112.    This claim is alleged in the alternative to Plaintiff's claims for money damages.

113.    Plaintiff and the class members have conferred substantial benefits on Defendant by paying fees to Defendant for the provision of services to terminated employees who had never been archived.  Defendant has knowingly and willingly accepted and enjoyed these benefits.

114.    The retention of these benefits by Defendant would be unjust because Defendant did nothing to earn said fees, nor did Defendant provide any services with respect to said terminated employees.

115.    Moreover, Defendant structured its billing and invoicing practices, as well as the language of its contracts with Plaintiff and the class, to obscure the existence of its fees and overcharges.  Defendant also informed Plaintiff and the class that they did not need to archive

terminated employees, and would not be charged for terminated, non-archived employees, when in fact they did and were.

116.    Equity demands disgorgement of Defendant's ill-gotten gains.  Defendant will be unjustly enriched unless Defendant is ordered to disgorge those profits for the benefit of Plaintiff and the class members.

117.    As a direct and proximate result of Defendant's wrongful conduct and unjust enrichment, Plaintiff and the class members are entitled to restitution from Defendant and institution of a constructive trust disgorging all profits, benefits, and other compensation obtained by Defendant through this inequitable conduct.

## COUNT V

## VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349

117.    Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

118.    New York General Business Law § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce.

119.    In its sale of services throughout the United States, Defendant conducts business and trade within the meaning of New York General Business Law § 349.

120.    Plaintiff and the class members are consumers who purchased services from Defendant.

121.    Defendant has engaged in deceptive and misleading practices, which include, without limitation: (a) using different criteria to calculate fees for different sub-services within the same platform; (b) failing to disclose, or failing to adequately disclose, to its customers that they would be charged additional fees for any terminated employees who were not archived, or

that they could avoid such a fee by taking the additional step of archiving terminated employees; (c) structuring invoices in a confusing and misleading manner so that its customers could not determine the accuracy of Defendant's charges or identify Defendant's overcharges; (d) failing to bill non-paid, non-archived employees separately from active employees, as required in its form customer agreements; and (e) misrepresenting that its customers did not need to archive employees, and that they would not be charged additional fees for terminated employees who were not archived, and then charging them for such non-archived employees.

122.    Defendant knowingly and willfully committed these deceptive acts and practices, for its own profit.

123.    As a result of Defendant's actions, Plaintiff and the class were forced to pay thousands of dollars to Defendant.

124.    By reason of this conduct, Defendant has engaged and continues to engage in deceptive conduct in violation of the New York General Business Law.

125.    Defendant's actions are the direct, foreseeable, and proximate cause of the damages that Plaintiff and the members of the class have sustained.

126.    As a result of Defendant's actions and violations, Plaintiff and the members of the class have suffered damages and are entitled to recover those damages as well as treble damages and reasonable attorney's fees from Defendant.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff asks this Court to:

a.    Certify this case as a class action pursuant to Federal Rule of Civil Procedure 23;

b.    Appoint Plaintiff as class representative;

c.    Appoint interim lead counsel as lead counsel for the class;

d.  Enter an order for injunctive and declaratory relief as described herein;

e.  Enter judgment in favor of each class member for damages suffered as a result of the conduct alleged herein and/or restitution, to include interest and pre-judgment interest;

d.  Award Plaintiff and the classes treble and punitive damages;

e.  Award Plaintiff reasonable attorneys' fees and costs; and

f.  Grant such other and further legal and equitable relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all issues so triable.

Dated:  March 9, 2021                    **DeNITTIS OSEFCHEN PRINCE, P.C.**

By:  _____

Stephen P. DeNittis, Esq.
315 Madison Avenue, 3rd Floor
New York, New York 10017
(T): (646) 979-3642
sdenittis@denittislaw.com

*Attorneys for Plaintiff*